Charles H. Albers, Receiver of Chicago Lawn State Bank, Appellee, v. Carl Westberg et al., Appellants.

Gen. No. 40,175.

42

Opinion filed February 14, 1939.  Rehearing denied February 27, 1939.

KINNE, SCOVEL, ROBSON & MURPHY, of Chicago, for certain appellants; HARRY C. KINNE, of counsel.

ALBERT A. GOMBERG and LOWENHAUPT & WOLFF, all of Chicago, for appellee; ALBERT A. GOMBERG and OSCAR M. WOLFF, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

William L. O'Connell, predecessor of Charles H. Albers, the present receiver, filed his complaint in the superior court to foreclose a trust deed made by Carl Westberg and Tilda Westberg, his wife, conveying real estate in Chicago known as the Spaulding avenue property, securing 159 bonds aggregating $60,000, upon which there remained due a balance of $53,000 and interest.  Carl, Tilda and Esther Westberg, who during the pendency of the suit married Ottar Aamodt, defendants, filed their answer to the complaint, admitting the execution of the trust deed and bonds, denying the existence of the indebtedness, and averring that the bonds, together with interest thereon, had been fully paid by Carl Westberg January 5, 1931. Dorothy Heaton, another defendant, disclaimed any interest in the property.  West Englewood Trust & Savings Bank, trustee, and others, were defaulted for

failure to appear. The Westbergs also filed their cross complaint, alleging payment of all the bonds secured by the trust deed together with interest thereon, and praying for a decree canceling the bonds in question and the removal of the trust deed as a cloud upon their title. The cause was referred, generally, to a master in chancery, who found that the trust deed was a valid and subsisting first incumbrance on the premises, that bonds, aggregating $53,000 and interest thereon from January 5, 1931, were unpaid, that Carl Westberg did not *pay* the bonds but *purchased* them from the Chicago Lawn State Bank, intending to keep them alive, and he recommended that a decree be entered pursuant to the prayer of plaintiff's complaint and that the Westberg cross complaint be dismissed for want of equity. Upon hearing, the chancellor overruled the exceptions to the master's report, filed by the Westbergs, and entered a decree in accordance with the master's recommendations, from which Carl Westberg, Tilda Westberg and Esther Westberg Aamodt have prosecuted this appeal.

Chronologically, the circumstances involved in this litigation may be summarized briefly, as follows: On December 15, 1925, Carl and Tilda Westberg borrowed $60,000 from the Chicago Lawn State Bank, and to evidence this loan they executed a bond issue and trust deed to West Englewood Trust & Savings Bank, as trustee, on an apartment building at 6215–19 South Spaulding avenue, Chicago, maturing December 15, 1930. August 31, 1927, the Westbergs conveyed the Spaulding avenue property to Henry J. Labotz and wife, subject to the bond issue in question. Thereafter, February 1, 1930, Labotz and wife gave Carl Westberg a note for $25,700, secured by trust deed to Edwin Robson, on the same property, which was recorded February 25, 1930. This trust deed was junior to the Westberg indebtedness and was stamped upon its face

as a junior mortgage. Prior to December 15, 1930, when the Westberg bond issue matured, the indebtedness was reduced by payment of certain bonds, to $53,000, and December 15, 1930, interest was paid on the bonds, but no additional payment was made on account of principal.

It appears from the evidence that Carl Westberg was a depositor at the Chicago Lawn State Bank, and a member of the board of directors. About December 15, 1930, Westberg had several conversations with John H. Bain, cashier and assistant to the president of the bank, with reference to the bond issue. Most of the unpaid bonds were then in possession of the bank, which owned bonds in the principal amount of $48,200. The balance of the indebtedness, amounting to $4,800, was owned by other persons. Bain then advised Westberg that the bank would not renew the loan.

January 2, 1931, Westberg filed his complaint in the superior court against Labotz and wife, to foreclose the second mortgage, which was dated February 1, 1930, alleging that the Spaulding avenue property was subject both to the second mortgage and also to the Westberg bond issue; that the value of the property was not sufficient to pay the Westberg bond issue and the second mortgage; and the appointment of a receiver was accordingly sought.

Some 3 days later, January 5, 1931, Westberg told Bain that he was prepared to take up the bond issue. Westberg then had on deposit at the Chicago Lawn State Bank $45,932.34. On the same day he borrowed $20,000 from the bank on his unsecured note, giving him a total deposit credit at the bank of substantially $66,000. Also, on the same day, Westberg gave the bank his check for $53,776.65, to cover the principal amount of the bonds, interest from December 15, 1930 to January 5, 1931, and $600 due the bank for insurance premiums. The bank thereupon delivered to

Edwin Robson, one of the attorneys for the Westbergs, the trust deed securing the bond issue, bonds 9, 10 and 11, which had been previously paid and canceled, and also the uncanceled Westberg bonds which the bank then had in its possession, aggregating $49,150. The trust deed was not stamped, indorsed or marked in any manner to indicate that it was canceled or discharged, and no release deed was issued. Neither were the bonds stamped or marked in any manner to indicate that they were paid or discharged. The receipt signed by Westberg's attorney for the $49,150 principal amount of bonds specified that the bonds were delivered uncanceled.

In February, 1931, some weeks after Westberg had paid the bank $53,776.65, he filed a verified petition for a receiver in the Labotz foreclosure proceeding, wherein he alleged that the Spaulding avenue property was subject to a trust deed made by the Westbergs to secure their 159 bonds aggregating $60,000, due December 15, 1930. Afterward, in April, 1931, the bank delivered to Westberg's representative all the bonds which had not been turned over to Robson on January 5. These bonds were not marked canceled or paid, and the receipt taken by the bank for these remaining bonds specified that they were delivered uncanceled. It thus appears that neither the trust deed nor any of the bonds, aggregating $53,000, were ever marked in any manner indicating payment, cancellation or discharge.

Still later, in April, 1931, some three months after Westberg paid the bank $53,776.65, a foreclosure decree was entered in the superior court on the Labotz mortgage, which contained a finding that the Spaulding avenue property was "subject to a prior trust deed, dated December 15, 1925," made by the Westbergs to secure 159 bonds aggregating $60,000, due December 15, 1930.

The Chicago Lawn State Bank was closed by the auditor of public accounts in June, 1931. Westberg then owed the bank $61,000 on five unsecured notes, and the Chicago Lawn State Bank was at the time indebted to the Continental Illinois National Bank & Trust Company to the extent of $207,300, for which it held as collateral security for the indebtedness, all of the five Westberg notes.

In August, 1931, Westberg secured an extension of his unsecured notes and deposited with the Continental Bank the Westberg trust deed and bonds and other collateral not involved in this controversy. An extension agreement was then entered into which recited that in consideration of the deposit of the collateral, "the bank agrees that it will take no action against Carl Westberg for the collection of said notes for a period of ninety days." In February, 1932, the receiver of the Chicago Lawn State Bank paid the Continental Bank the balance of $29,716.95, which then remained due from the receiver, and at the same time Westberg gave the Continental Bank written instructions to deliver the bonds and trust deed to the receiver.

The controverted question is whether the transaction of January 5, 1931, by which Westberg paid the Chicago Lawn State Bank $53,776.65, constituted a *purchase* by the Westbergs of their mortgage bonds and trust deed, or an *extinguishment* of these instruments. Under the well settled law in this State that question must be resolved from the intention of the parties, as shown by statements made and circumstances existing before the controversy arose. 19 Ruling Case Law, Mortgages, sec. 228, p. 444, gives the rule as follows: "Parties to a mortgage, as between themselves, notwithstanding payment in full has been made by the debtor, may continue the lien of the mortgage for the security of another debt, provided the

rights of other mortgage and judgment creditors have not intervened. . . . And where, upon the payment of the debt secured by a mortgage, it is the intention of the mortgagor to keep the obligation alive, it has been held that it may be assigned to, and enforced by, a third person as security for another indebtedness.''

In *Kazunas v. Wright,* 286 Ill. App. 554, the question arose as to whether the mortgage notes had been paid by a series of transactions at the Cottage Grove State Bank, and in discussing that question, it was held (p. 559): ''. . . that the defense of payment is not sustained by the evidence. The transaction in which Myrtle Rooms, Catherine Sullivan, Cramer, and the Cottage Grove State Bank and its cashier, Johnson, participated did not amount to payment of the notes for the reason that such manifestly was not the intention of the parties to the transaction. This is indicated by the written evidence, by the fact that the notes were delivered uncanceled, and by all the circumstances which distinguish that arrangement.''

41 Corpus Juris, Mortgages, sec. 904, p. 790, also states the general rule that where the mortgage debt is paid the mortgage may be kept alive for other purposes, where such is the intent of the parties and the rights of third persons and creditors have not intervened, and says that ''whether as between the parties a transaction constitutes a payment and discharge of a mortgage is dependent upon their intention, and it will not have such effect where they mean to keep the security alive and not to extinguish it.''

The evidence and findings which prompted the master to conclude that Westberg did not pay the bonds but purchased them for the purpose of keeping them alive, is fully set forth in his report. He found that ''Westberg dealt with and treated said trust deed and the unpaid bonds secured thereby, as if they were a valid and existing lien upon the property,'' and that.

"it was the intention of Carl Westberg to preserve the lien of said trust deed . . . in full force and effect." The numerous circumstances indicating this intention on the part of Westberg, as enumerated by the master and amplified in plaintiff's brief, may be summarized as follows: Obviously, if the Westbergs had intended to pay the bonds and discharge their obligation, they would in all likelihood have had these instruments canceled so that they would no longer constitute a valid obligation against them. Nevertheless, when Westberg's attorney gave a receipt to the bank January 5, 1931, it showed upon its face that bonds Nos. 9, 10 and 11, which had been previously paid, were all delivered canceled, and that the other bonds, aggregating some $49,000, were delivered uncanceled. Likewise, if the Spaulding avenue property was to be relieved from the lien of the trust deed, it is difficult to understand why Westberg's attorney did not insist on a cancellation of the trust deed and the issuance of a release deed from the trustee to indicate that Westberg's obligation had been fulfilled. There is also the circumstance that some six weeks after January 5, 1931, when Westberg paid the bank $53,776.65 for these bonds, he filed a verified petition in the Labotz foreclosure asking for the appointment of a receiver, containing the allegation that the real estate was subject to a prior trust deed, dated December 15, 1925, securing 159 bonds aggregating $60,000. This was an unqualified statement made by Westberg under oath in a judicial proceeding that the property was subject to the trust deed in question, and if it had been paid and released, as Westberg now contends, that representation to the court was manifestly not in accordance with his understanding of the transaction at the time he applied for a receiver.

The record further discloses that on April 10, 1931, the bank delivered to Westberg all the bonds which had

not been turned over to him on January 5, aggregating $3,850. Westberg's attorney then gave the bank a receipt which was introduced in evidence, clearly indicating that these bonds were delivered uncanceled, and with the consummation of this transaction the Westbergs had in their possession, uncanceled, the entire $53,000 of bonds which had matured December 15, 1930. The decree of foreclosure on the Labotz mortgage, which was entered April 22, 1931, specifically found that the Spaulding avenue property was subject to a prior trust deed dated December 15, 1925, securing 159 bonds aggregating $60,000, with interest. This decree, entered some 3 months after January 5, 1931, specifically found the Westberg bonds and trust deed an existing lien on the property, and since the decree was entered in Westberg's favor and was procured by him, it is inconceivable that he would have asked or permitted such a finding had there been an intention on his part to treat the obligation as a payment and extinguishment of the indebtedness. Later, in June, 1931, when the bank was closed by the auditor of public accounts, Westberg was indebted to it on 5 unsecured notes, and the bank was in turn indebted to the Continental Illinois National Bank for some $200,000, for which it held Westberg's 5 unsecured notes along with other collateral as security for the debt; and in procuring an extension of Westberg's debt to his own bank the agreement with the Continental Bank by which that extension was effected recited that Westberg was indebted to the Chicago Lawn State Bank upon his five unsecured notes, and that the Continental Bank held these notes as collateral security for the indebtedness of the Chicago Lawn State Bank which had been reduced to $53,973.25. Westberg's attorney then deposited with the Continental Bank the identical bonds and trust deed which had been delivered to Westberg January 5, 1931. It thus appears that these bonds

were assigned to the bank as a valid obligation, and had they been paid and extinguished, as Westberg contends, Westberg would not have tendered them as an existing indebtedness nor would the Continental Bank have received them as such. As a matter of fact, these bonds and trust deed had not been in Westberg's possession since August, 1931, but were delivered by the Continental Bank on Westberg's order to the receiver of the Chicago Lawn State Bank, who had them in his possession when this foreclosure was filed. In addition to these circumstances there is correspondence in evidence clearly indicating that the Westbergs intended to keep the title to the bonds and trust deed definitely separate and distinct from the title to the real estate, which was conveyed to Westberg's daughter in April, 1931, pursuant to the master's sale in the Labotz foreclosure. In February, 1932, the receiver of the Chicago Lawn State Bank paid the Continental Bank the balance then due it and in return received the collateral held by the latter, including the Westberg unsecured notes and the bonds and trust deed in question. This transfer was carried out in pursuance of a letter written by Westberg's attorney to the receiver of the bank. Up to this time there were at least four instances in which Westberg had for his own purpose and advantage treated the bonds and trust deed as valid and existing obligations; in February, 1931, when in order to secure the appointment of a receiver on the Spaulding avenue property his verified complaint stated that the bonds were a prior incumbrance on the real estate; in the decree of foreclosure entered in the Labotz matter in April, 1931, these bonds were listed as a prior incumbrance on the property in order to preserve the lien of the trust deed in case Labotz should redeem from the second mortgage foreclosure; in August, 1931, the bonds and trust deed were delivered to the Continental Bank as collateral to West-

berg's unsecured notes; and in February, 1932, West-
berg, in an endeavor to arrange a settlement of his
unsecured notes, transferred the bonds and trust deed
from the Continental Bank to the receiver, still using
these bonds and trust deed as collateral for payment
of the unsecured notes.

If Westberg's transaction with the Chicago Lawn
State Bank January 5, 1931, was a purchase, all the
subsequent uses of the bonds and trust deed here
enumerated were entirely proper; on the other hand,
if the transaction constituted payment, Westberg's
present contention is entirely refuted by his subse-
quent actions and should not be countenanced by a
court of equity. All of Westberg's acts from Janu-
ary 5, 1931, indicate that he intended to keep the lien
of the trust deed alive. It is obvious that in so doing
the Westbergs were protecting their second mortgage
against liens which might have intervened after the
Westberg trust deed and prior to the Labotz mortgage.
By keeping the first mortgage alive, the Westbergs
made it possible to enforce payment out of the prop-
erty in accordance with the terms of their deed to
Labotz. It is difficult to interpret Westberg's state-
ments and acts as anything except an effort to keep
the lien of the trust deed alive in accordance with a
perfectly logical plan for his own advantage. On the
other hand, we find no convincing facts or circum-
stances of record indicating that Westberg intended
that the lien of the trust deed should be extinguished,
and from the evidence adduced before the master, no
other conclusion than that this was a purchase could
fairly have been reached.

Plaintiff's counsel argue with considerable force
that the Westbergs should be estopped from denying
the validity of their bonds and trust deed, because of
their repeated representations that these instruments
were valid and subsisting obligations, as shown by the

circumstances hereinbefore enumerated. It has been held that where a party gives a reason for his conduct touching upon matters involved in a controversy, he cannot, after suit is started, shift his position and put his conduct upon another and different ground. (*Gibson v. Brown*, 214 Ill. 330; *Miller v. Gordon*, 296 Ill. 346.)

One of the reasons urged for reversal is that plaintiff was not entitled to a decree finding that he was the owner of the bonds in question, and for more than the amount of Westberg's unsecured note indebtedness. Neither of these contentions was raised by the pleadings or by the exceptions filed to the master's report. In the hearing before the master and chancellor defendants insisted upon the defense of payment, and argued that the possession by a mortgagor of the bonds secured by his trust deed raised a presumption that the bonds had been paid. The courts have consistently held a defendant cannot raise questions on appeal which were not brought to the attention of the trial court. (*Notroma Corp. v. Miller*, 292 Ill. App. 612, 618, 619; *Bryan v. Pilgrim Nat. Life Ins. Co.*, 294 Ill. App. 356; *Taylor v. Baker*, 295 Ill. App. 1.)

After careful consideration of the evidence and circumstances surrounding Westberg's various statements and transactions, we are of the opinion that the chancellor properly entered a decree in accordance with the findings and recommendations of the master, and therefore the decree of the superior court is affirmed.

*Decree affirmed.*

BURKE, P. J., and JOHN J. SULLIVAN, J., concur.