THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *v.* JAMES A. HYDE, Appellant.

(No. 70-67;

Fifth District—October 13, 1971.

*Rehearing denied November 11, 1971.*

832

834

John O. Vogel, of Glen Ellyn, for appellant.

Robert H. Rice, State's Attorney, of Belleville, for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

In a trial before a jury the defendant and Kascell Jennings were convicted of murder, armed robbery and unlawful restraint. Although the jury recommended the death penalty upon the murder conviction the court declined to impose it and sentenced defendants to concurrent terms of 99 to 100 years on the convictions for murder and armed robbery. The record does not disclose that any sentence was imposed upon the conviction of unlawful restraint, the maximum penalty for which is set by Ill. Rev. Stat., ch. 38, par. 10—3(b) at two years imprisonment and a fine of $500. Upon defendant's motion the attorney representing him in this appeal was discharged and leave granted to proceed *pro se.*

The armed robbery and murder in question occurred at Lee's Wash Rack on North First Street in East St. Louis. The location is near the National City stockyards and the establishment is a facility used by truckers of livestock to the National City stockyards to clean out their trucks after delivery of livestock. There is a building on the premises containing an office, a bunkhouse and a small restaurant. The wash racks are no more than a portion of the lot where the trucks are swept out and washed with hoses and other equipment. The wash rack operates at all hours of the day and night. The wash rack is well lighted by a system of lights arranged to illuminate the area for work conducted during the night time.

Defendant initially argues that the evidence was insufficient to convict him because of the confusion, uncertainty and contradiction of the identification witnesses. In this same regard he contends that the testimony of his alibi witnesses was more probable and believable than that of the State's witnesses and that this court should so find and reverse his conviction.

We will briefly summarize the occurrence testimony of the State's

witnesses. Ollie Johnson was the night foreman at Lee's Wash Rack. He testified that at about 3:00 A.M. he was outside the bunkhouse talking with two truck drivers when two men walked onto the lot and approached him and asked directions to a particular address. The two men were characterized as one taller and one shorter. The shorter of the two men put a gun in his face and said, "This is it." The taller man walked around the corner of the building. The shorter man was right upon the witness when he pointed the gun, within a hands reach. The witness and the other two robbery victims were made to lie on the ground while the short man went through their pockets taking their billfolds and money. The victims were then made to crawl under a truck at the side of the building. Other men were later brought to the truck and made to crawl under. Shots were heard. The short man then came to the truck, bent over and told a man by the name of Kelly one of the fellows was hurt, to count to 50 and call the police and an ambulance. The voice was the same as that of the short man. The witness did not see the second man involved in the holdup and was unable to identify defendant Hyde as a participant in the holdup. After the witness crawled from under the truck he saw a man lying on his back by the bunkhouse door. He had been shot in the head and was bleeding from the wound. The witness then made a positive in court identification of the defendant Jennings. He had testified that there were lights all over the place.

Danny Hatcher was a 19-year-old truck driver who had made a delivery of cattle to the National City stockyards and brought his truck to Lee's Wash Rack for cleaning before his return home. He was accompanied on his trip by his wife. When he arrived at the wash rack other trucks were being cleaned and washed. He got out of his truck and gave instructions to witness Johnson regarding the cleaning of his truck and got back into the truck to talk to his wife. After ten or fifteen minutes his wife got into the sleeper portion of the cab to sleep and the witness again left his truck and went to talk with the witness Johnson and another truck driver. The two truck drivers and Johnson were there together with Johnson in the middle. As the three were talking a man walked up and asked directions of Johnson. Johnson started giving the directions and when he turned around the other fellow walked right up to his face and pointed a gun. The man said "This is a stickup, lie face down on the ground." The three laid down and the man went through their pockets taking money and wallets. The three were then told to crawl under a truck behind the bunkhouse by the same man who asked for directions. He heard three shots. After the shots the shorter of the two men came to the truck, kneeled down and said, "I have shot him, count to 50 and then call the police." While he was lying on the ground

he looked towards his truck off to the left and the taller of the two men was walking up to the side of his truck. The witness made a courtroom identification of Kascell Jennings as the man who kneeled down and said, "I have shot him, call the police." He then identified defendant Hyde as the other man who had walked over to his truck. When he got up from under the truck he ran around the building and discovered the man lying on his back at the bunkhouse door. He had a bullet wound on the right side of his head and was bleeding. He went to his truck to see about his wife and discovered she was gone. He next saw her at the police station between 3:30 and 4:00 A.M. She was scared and nervous and had a cut on her foot but was otherwise uninjured. The witness further testified that he had previously identified both defendants at the police station, that at the time of the incident the hair of defendant Jennings was long but at the time of the identification at the police station it was short. He further testified that he was not close enough to the taller to see what color clothes he had on, that he saw him only once when he was walking up along side his truck. On cross-examination he stated that he was basing his description of the taller man upon his height. At the time defendant Jennings first approached to ask directions he was within about two and one-half feet of the witness.

Genise Hatcher testified that she was 18 years of age and the wife of Danny Hatcher. At about 2:00 A.M. on the evening in question she was in the truck with her husband and got into the sleeper portion of the truck to sleep. She heard a loud noise like a firecracker. Shortly a Negro man came up and opened the door. When she told him her husband was outside he got down from the cab and left. A few minutes later another man came up and made her get out of the truck. He sort of bent over so he could see her. His face was about three feet from hers. He was also a Negro. Both of the men had guns. When told to get out of the truck she asked the man if she could get her shoes but he told her she didn't need them, just to get out. Neither of the men were covered or wearing anything on their heads. She was made to stand over by the bunkhouse and saw her husband and some other men under a truck. At that time the shorter man was standing beside her and the taller man behind her. She turned around and the man they had shot was lying there. She saw the man lying on the ground and heard the shot fired but did not see who fired the shot. The victim was lying near the bunkhouse door. The taller of the two men took her and put her by the building. He then went back and got her and put her on the floor boards of the car. The tall man told her to lie down and keep her face down on the floor boards. The car was a 1963 red Chevrolet convertible with the top down. She was taken to the National City dump, made to remove her blouse

and put it over her head, was walked down a path by the men and told to stay there until they left. She shortly made her way to a plant where the night watchman called the National City police. The witness pointed out defendant Hyde as the man who first came to the truck when she was in the cab and the defendant Jennings as the man who came to the truck later. She stated that she did not see the defendants shoot the man but that the shorter man of the two was about two or three feet from the man who was shot at the time she heard the shot.

Ernest Campbell testified that he was a part-time employee at the wash rack. On the day in question he worked the day shift but he returned about 12:00 to get something to eat. He came out the restaurant about 2:00 A.M. walked toward the east end of the bunkhouse. Just as he got around the corner a man with a gun halted him and made him crawl under the truck. He only saw one man with a gun. He was four or five feet away. It was in the dark and he didn't know how the man was dressed. He crawled through to the other side of the truck and went in the back part of the building and stopped and waited about midway of the building and heard a gunshot. He stood there a few minutes and walked toward First Street and saw two fellows running up the street with a girl by the hand. Each one of them had her by a hand. The car they left in was a maroon convertible. On cross-examination he testified that he saw nothing that happened and could not identify either of the men.

George Woolridge testified that he was a truck driver hauling livestock, that he was at Lee's Wash Rack at the time of the robbery and murder, arriving there about 12:30, that he was finished with the clean out at about 2:00 o'clock. He was with Hatcher and Johnson near the bunkhouse door when two boys came up to ask about an address and one boy who walked up said "all right, this is a holdup." He had a gun. The three were made to lie on the ground and their billfolds were taken. The three were then told to get under the truck at the end of the bunkhouse. After that he heard a shot fired. Then one of them came back and told them to count to 50 before we got up. He did not recognize the voice that said that. There were some other trucks there but no drivers. The man who came up had dark glasses on. He didn't notice if he had anything else on his head. The witness made an in court identification of defendant Jennings as being the man. When he got out from under the truck he saw a white man lying there by the north door of the bunkhouse with a hole in his head. It was bleeding. The witness did not identify defendant Hyde.

James E. Kelly was employed at Lee's Wash Rack as a washman. He was present during the event in question, seated on a bench facing the

wash rack grounds near the door to the kitchen. Two fellows came up, one passed by and the other stopped and asked for an address. The men were colored, one little and one tall. The little one went to the end of the bunkhouse and around to the back. The tall one stopped there between him and his friend and asked for an address. Upon being told that they did not know they were then told to look around to see where the other fellow went. The witness and his friend were then told by the tall man to get over and lay under a truck. He had a gun in his hand. After they were under the truck they heard three shots—not too far apart. They came from around the front of the building. Another man was brought back to the truck and made to crawl under. After the robbery a woman was brought from out of a truck parked in the rear and made to stand about five feet from where the men were under the truck. The tall guy put a gun to his head and told him to count to 50 and call the police and an ambulance. The two men then got the woman by the arm and put her in the convertible. After the witness got up he saw a man lying there shot. The witness then identified defendant and Kascell Jennings as the two men who came to the wash rack and did the robbery.

Defendant asserts that the testimony of the People's identification witnesses is unworthy of belief because (1) Danny Hatcher informed police that both assailants were clean shaven when in fact he, the defendant, had a moustache, and that Danny Hatcher based his description of defendant on his height: (2) Genise Hatcher was blindfolded and could not see anything and had stated to police that both her abductors were clean shaven; (3) James Kelly based his identification of defendant only upon his size.

■■ These contentions are simply not borne out by the record. We have been unable to find any statement by any witness that both assailants were clean shaven. Nor do any of the police reports which defendant has included in the record reflect that any witness had described the assailants as clean shaven. The only place the "clean shaven" allusion appears is in a bulletin or arrest notice issued by the Madison, Illinois Police Department. It does not appear that that police department was ever involved in any way with the investigation of the crimes and the statement in their bulletin that the suspects were clean shaven, being otherwise unsupported, must be considered spurious and unavailing as an impeachment of the identification testimony. While it is true that on cross-examination Danny Hatcher and James Kelly stated they were basing their identification of defendant on his size it is readily apparent from a reading of their testimony that by no means was size their only criterion for identification. Each of the three identification witnesses, Danny Hatcher, Genise Hatcher and James Kelly, were in a good posi-

tion to observe, and did observe, the assailants under conditions that lend veracity to their observations. All three identified both defendants in lineups and at the trial. They asserted their positiveness and remained unshaken on cross-examination.

The defendant testified in his own behalf, denied the robbery and shooting, offered an alibi and produced three witnesses in its corroboration. He stated he worked as a laborer until 4:30 P.M. on July 22, 1969. He then went home, cleaned up and went to the home of his sister-in-law, arriving there at about 5:30. From there he left with Mary Alice Lewis and went to the Dunbar School to pick up his sister-in-law. He then traced his whereabouts throughout the evening in the company of Mary Alice Lewis, his sister-in-law and others until he finally left their home, walking, at about 2:30 A.M. on July 23, 1969. Defendant's stster-in-law, her sister (Mary Alice Lewis) and her mother testified to substantially the same events and times as those told by defendant.

■■ Our reading of the testimony of the witnesses for both the People and the defendant leads us to the conclusion, as its hearing did the jury, that the guilt of defendant was firmly grounded on sufficient evidence to convict and that defendant's guilt was proven beyond a reasonable doubt. That the jury chose to disbelieve defendant and his alibi witnesses is unavailing to defendant as error since it is within the province of the jury to choose whom to believe or disbelieve.

We turn, then, to the consideration of alleged errors which occurred during the trial which defendant contends were prejudicial and served, singularly and in the aggregate, to deprive him of a fair trial and therefore require reversal of his conviction.

Defendant strenuously urges that prejudicial error occurred when the prosecutor elicited evidence that the deceased victim was married and supporting a family and compounded the error by introducing photographs of the deceased showing some of his children on his lap and commenting on deceased's family in final argument.

The widow of the victim was called as a witness by the People for the purpose of identification. In response to questions she stated that she was the widow, that she and deceased had six girls, two of which were still at home. She identified four photographs of deceased two of which were taken approximately ten to twelve years prior and two of which were taken approximately two years prior. One of the two or more recent pictures showed deceased holding a child and the other showed him sitting with a child in his home. In support of the admission of the photographs the People argues that they were a necessary link in the chain of tracing the body of the man shot at Lee's Wash Rack to the man who was identified at Desloge Hospital by his widow and were

therefore a necessary part of the State's case. When the court asked defendant's attorneys if they would stipulate that the earlier photographs of deceased were a reasonable likeness of him at the time of death even though taken some years ago the stipulation was refused, whereupon all four photographs were admitted into evidence. The widow testified that she identified the body of her husband at Desloge Hospital. There was no objection from either of the attorneys for the defendants to the testimony of the widow regarding the family of deceased.

In the first portion of the closing argument one of the prosecutors made this remark: "What happens to this man who is doing his best, who has a wife and family and trying to earn a living? All he does is try to have his truck cleaned out, and the end result is, two men like this, two hardened criminals, snuff his life out." In the second portion of the closing argument another prosecutor made this remark: "They snuff out the life of an innocent man. A man who had no way of defending himself. A man just trying to do his job, to support a wife and children."

■■■ It is well established that it is improper for a prosecutor to refer to the family of a murder victim, whether such reference be by evidence or in argument. (*People v. Dukes*, 12 Ill.2d 334, 146 N.E.2d 14; *People v. Gregory*, 22 Ill.2d 601, 177 N.E.2d 120; *People v. Bernette*, 30 Ill.2d 359, 19 N.E.2d 436; *People v. Brown*, 30 Ill.2d 297, 196 N.E.2d 664; *People v. Golson*, 32 Ill.2d 398, 207 N.E.2d 68; *People v. Vasquez*, 118 Ill. App.2d 66, 254 N.E.2d 617.) Such evidence has no relation to guilt or innocence of the accused or the punishment to be accorded him and is originarily calculated only to prejudice the defendant with the jury. In *People v. Bernette, supra*, the Supreme Court observed that the rule has devolved.

> "* * * that where testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence."

Thus, the mere fact that evidence of a victims wife and family appears incidentally in the trial or is the subject of comment by the prosecutor in his argument does not automatically require reversal. The materiality of the testimony or comments, and the manner of its presentation must be considered. As stated by the Supreme Court in *People v. Golson, supra:*

> "We have reversed judgments of conviction of murder where undue prominence was given to the fact that the deceased had left a family, where it appeared that this evidence and argument was used solely for the purpose of prejudicing and inflaming the jury. (People v. Dukes,

12 Ill.2d 334; People v. Bernette, 30 Ill.2d 359.) However, we have also refused to reverse convictions where objection has been made to testimony and argument concerning the deceased's family. In the recent case of People v. Brown, 30 Ill.2d 297, the prosecutor referred to the fact that the deceased's wife was now a widow and that his children were orphans. We held that the statement was not reversible error and pointed out that the widow had testified solely for the purpose of identifying the deceased. We also pointed out that the first reference to the decedent's children was made by defense counsel who expressed his sympathy to the widow and her children. In our opinion the testimony and argument were not of such a nature as to require reversal of the judgment of conviction  *  *  *."

Our review of the cases considering the question of whether testimony and argument concerning the deceased's family leads us to conclude that it is an unnecessary component of a decision to seek to align the testimony and comments we are considering in this case with cases which on the one hand require reversal and those which on the other hand do not. We find, rather, that the cases disclose a practical consideration of the effect of such improper evidence and argument upon the conviction of a defendant. Such view makes relevant all cases dealing with the matter and permits a consistency in their application. It is proper to inquire to what extent, for what reason and to what effect testimony or comments regarding the deceased's family are advanced. Here we note that the prosecutor made no attempt to dwell upon or draw out the testimony regarding deceased's family. No attempt was made to present it as an issue in the case or a matter proper to be proven and considered. Its materiality was in no way suggested. Its presentation was incidental to the matter of identification of deceased and its effect upon the outcome of the trial minimal. Any effect resulting would be mollified by the testimony of the parents of the co-defendant Kascell Jennings when they testified to his alibi defense and termed him a good son and a religious boy. There are cases where the conduct of the victim is brought into question in determining the guilt of an accused. There, evidence of the fact that the victim was a family man might tip the scales against the accused. Here, clearly unjustified conduct is involved, the victim was wholly innocent. Whether he has a family is a small consequence as to whether a crime was committed. The victim's family status could not add aggravation to a crime which by its very nature is the ultimate aggravation.

■■   The conviction here is not based upon circumstantial evidence but upon eyewitness testimony and positive identification. Under this circumstance we are led to conclude that the conviction of defendant was the

result of the strong evidence of guilt and did not result from any passion or prejudice that may have been engendered by improper evidence and argument regarding deceased's family. We view the evidence and argument here as no worse than those in the *Brown, Golson* and *Vasquez* cases where a similar result was reached.

■■ Defendant next urges that prejudicial error occurred when the State knowingly suppressed a police report containing evidence favorable to him, citing *Brady v. State of Maryland,* 373 U.S. 85, 83 S.Ct. 1194. Although defendant never made a request that he be furnished with copies of police reports either before or during trial as required by *Brady* we have nevertheless elected to consider the matter. The argument alludes to two police reports, one relating to witness Genise Hatcher and one to a Willie Boyd Whitney. Included in the record is a police report by Sgt. Brooks of the National City Police Department which recites that when Mrs. Hatcher was picked up by them following the incident in question she related a robbery and shooting and her abduction. The report contains a recital that Mrs. Hatcher stated that she was blindfolded all the time. Two other police reports of interviews by officers of the East St. Louis Police Department with Mrs. Hatcher report her as saying, as she testified, that she was made to cover her head with her blouse when she was released at the National City dump. We note that the report of the National City Police Department also relates that Mrs. Hatcher gave a description of the two men involved in the robbery and shooting and a description of the automobile in which she was abducted, observations which she clearly could not have made had she been blindfolded "all the time" as suggested in the police report. The report is thus intrinsically inconsistent. And when it is compared with the testimony and in context with the two police reports of the East St. Louis Police Department there is no inconsistency and nothing that could be considered as evidence favorable to the defendant or impeaching of Mrs. Hatcher's testimony.

■■ Also in the record is a police report of the East St. Louis Police Department which relates that on July 23 a Mr. Willie Boyd Whitney of a given address and phone number called the police department and stated that he had witnessed the shooting and that at the time he noticed a Negro was standing and pointing a gun at deceased, that the Negro held a gun in his left hand and after hearing about four or five shots he observed deceased fall to the ground and the man with the gun reached over deceased's right shoulder and removed something from his pocket. He also is reported to have stated he would not be able to identify the man if he were apprehended. He gave a description of the gunman as a Negro male, six foot tall, 200 pounds or more, dark complected, wearing

a white cap or hat with a very short or small brim pulled close down on his face, wearing a dark shirt and trousers. While the report does remark that a caller stated he witnessed the shooting and that the gunman wore a cap it still cannot be considered that evidence favorable to defendant has been suppressed. Nowhere in the record is it suggested by any witness, or is it to be inferred from the evidence, that the gunman was the defendant. Accordingly, the caller's description of the assailant has no relevance to defendant. The statement makes no reference to a second man being involved nor any attempt to describe him. Furthermore, the police report in question is not a report of an investigation by the police nor does it reflect any action taken or information discovered upon their part. It is merely the report of a telephone conversation with a person who identified himself as Willie Boyd Whitney. Defendant made a demand for a list of witnesses and it was furnished by the People and Willie Boyd Whitney was listed together with his address. The name of Willie Boyd Whitney was not mentioned by any of the witnesses as being present at the time of the crime or as having any knowledge of the occurrence. Whitney did not testify in the case. Under this circumstance it cannot be said that the State has withheld or attempted to suppress anything favorable to the defendant. The State met any burden of fairness that the situation might impose upon them when they disclosed the name and address of Willie Boyd Whitney in the list of witnesses.

Defendant also assigns as error the failure of the court to give an instruction to the jury as to the essential elements of the offense of murder. Defendant admits that his attorneys did not offer such instruction but contends, under the authority of *People v. Davis*, 74 Ill.App.2d 450, 221 N.E.2d 63, that the trial judge was obligated to give the instruction on his own motion.

■■ Examination of the transcript shows that the court gave I.P.I., Criminal, number 2.01 which informed the jury that defendant was charged with the crimes of murder, unlawful restraint and armed robbery. I.P.I., Criminal, number 7.02 was also given. This instruction, which informed the jury of the burden of proof which must be met by the State in proving the defendant guilty of murder, necessarily contained all the elements of the crime of murder. It should be noted here that the common law record contains I.P.I., Criminal, number 7.01 which defines the crime of murder. It is shown with the other instructions given in the case and contains the file stamp of the court clerk showing it to have been filed on the same date as the other instructions. However, the transcript does not reflect that 7.01 was in fact given. In this state of the record we cannot determine whether or not 7.01 was read to the jury with the

other instructions. We believe that even though 7.01 was in fact omitted that no prejudicial error resulted since 7.02, which was given, sufficiently advised the jury of the elements of the crime of murder so there could have been no confusion or uncertainty resulting. Where the instructions, as a whole, inform the jury of the facts which are essential to the proof of the commission of a specific crime, an error in giving an instruction will not be considered so prejudicial as to warrant a reversal. *People v. Knox*, 116 Ill.App.2d 427, 252 N.E.2d 549.

■■■ Defendant also argues that error was committed when his prior criminal record was initially brought to the attention of the jury by testimony rather than by the record of the prior conviction. The contention arises from the fact that when defendant's co-defendant, Kascell Jennings, was being cross-examined by the prosecutor he told of having met defendant on prior occasions in the county jail in Belleville and in the penitentiary at Menard, facts from which the jury could naturally infer that defendant had a prior criminal record. As we have noted, defendant testified in his own behalf in support of his defense of alibi. In rebuttal the State called as a witness the Chief Deputy Circuit Clerk of St. Clair County and had her identify as part of the files of her office the record of two previous felony convictions, one for burglary and one for theft. At the request of the prosecutor the clerk read the two records into evidence but neither the files nor authenticated copies thereof were then physically offered into evidence. Defendant also contends this was an improper method of proof of his prior felony convictions and cannot be thus considered for impeachment purposes. The contentions are not well taken. It is now established rule that cross-examination of a defendant concerning former convictions is improper except where an authenticated copy of the record is also admitted. (*People v. Neukom*, 16 Ill.2d 340, 158 N.E.2d 53; *People v. Squires*, 27 Ill.2d 518, 190 N.E.2d 361; *People v. Smith*, 63 Ill.App.2d 369, 211 N.E.2d 456.) And it is of no consequence that the record of prior convictions is presented by having the keeper of the records, the court clerk, read the record into evidence rather than introduce the physical record itself as an exhibit. (*People v. Smith, supra, People v. McCrimmon*, 37 Ill.2d 40, 224 N.E.2d 822.) Since the testimony of defendant's prior convictions came from his co-defendant rather than from defendant himself his argument has even less force than those advanced and rejected in *Neukom, Squires, Smith* and *McCrimmon*.

■■ With further regard to the record of his prior convictions the defendant contends that it was error to present them to the jury in whatever manner. Subsequent to the decision of the Supreme Court in *People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695, defendant's argument

would be well taken if the prior convictions of defendant were judicially determined to have no relation to his credibility as a witness. However, defendant's trial was prior to the *Montgomery* decision which notes that its application shall be prospective only. Defendant's impeachment by presenting evidence of a prior conviction of a felony was proper at the time of his trial and no error was committed by presentation of the record of his prior convictions to the jury for impeachment purposes.

■■ Defendant also contends that a fatal variance has occurred in that he was charged with murder in the indictment but the proof was that Kascell Jennings, not defendant, had done the shooting. But this contention is unavailing for under the evidence presented here the defendant was properly charged, tried and convicted as a principal. We quote from *People v. Touhy*, 31 Ill.2d 236, 201 N.E.2d 425:

"A ready answer to defendant's contention is found in the report of the committee which drafted the 1961 Code, a source to which we may properly look in determining the legislative intent. (Moran v. Bowley, 347 Ill. 148; Ernhart v. Elgin, Joliet and Eastern Railway Co. 405 Ill. 577.) In that report, which was titled "Tentative Final Draft of the Proposed Illinois Revised Criminal Code of 1961," it was commented at page 292 with reference to section 18-2: 'The reference to confederates is eliminated as unnecessary. The principles of accountability stated in Section 5-2(c) of this Code are deemed to cover such accessoryship situations adequately.' Section 5-2(c), referred to, supplanted section 2 of division II of the prior law, (Ill. Rev. Stat. 1959, chap. 38, par. 582,) and provides the following: 'A person is legally accountable for the conduct of another when: * * *(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.' (Ill. Rev. Stat. 1961, chap. 38, par. 5-2(c).) Further, it is provided in section 5-1 of the new Code: 'A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5-2, or both.' "

■■ Defendant has also contended that reversible error was committed by reason of his arrest without a warrant contending that there was no probable cause for such an arrest, and has argued that *Whiteley v. Warden* (1971), 91 S.Ct. 1031 is applicable. Since there was no evidence seized at the time of defendant's arrest for later use at the trial, any issue that may have arisen out of the warrantless arrest was rendered moot when the defendant was indicted by the grand jury.

Defendant finally contends that his counsel was incompetent to the

extent that he was so inadequately represented that he had been deprived of the constitutional requirement of due process of law.

■■  In *People v. Georgev*, 38 Ill.2d 165, 230 N.E.2d 851, a similar contention was made and the court set forth what is necessary to establish inadequacy of representation by counsel so as to require a new trial. The court stated:

"What is necessary to establish inadequacy of representation by counsel so as to require a new trial, where the attorney has been appointed by the court, has been described by this court in People v. Morris, 3 Ill.2d 437, at 449. '(B)ased both on precedent and reason, we believe that in order to sustain his position here the defendant must clearly establish: (1) actual incompetence of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different.' We said, too, in People v. Cox, 22 Ill.2d 534, at 537, 538: 'The defendant next contends that appointed counsel was incompetent. This contention is based on decisions recognizing that the incompetence of counsel may be such as to deny a defendant the fair trial that is contemplated by provisions of the State and Federal constitutions. The question of whether a defendant was adequately represented by competent counsel must be answered solely from the circumstances of each particiular case (People v. Francis, 356 Ill. 74); and in order to sustain his position the defendant must clearly establish actual incompetency of counsel and substantial prejudice resulting therefrom, without which the outcome would probably have been different. People v. Morris, 3 Ill.2d 437.' "

■■  Here, as in the case of most trials, the conduct of the trial may be viewed in retrospect and errors of both omission and commission detected and a more effective trial strategy evolved. Defendant charges his attorney with incompetence because of his alleged failure to prevent those errors in the trial which defendant has advanced in this appeal. But, as we have seen, most of the alleged errors were not errors and as to the remainder it cannot be said that there was any failure or shortcoming upon the part of the attorney, but rather that it was a matter of weighed and conscious choice to proceed as he did. We think the record shows a skillful defense of a case difficult to defend. Defendant was implicated and identified by several eyewitnesses. An alibi defense was advanced and thoroughly presented to the jury for their consideration. Cross-examination of the State's witnesses by both defendants' attorneys was vigorous. Counsel's final argument fairly and adequately presented defendant's case to the jury. When considered in the light of the task which faced him, defendant's attorney's representation must be termed effective. That

he did not prevail is understandable but this cannot be the measure of his merit in defendant's behalf. We think, therefore, that defendant's charges of incompetency of his attorney are not well taken.

In sum, we feel the record discloses that although defendant did not receive a trial entirely free from errors he nevertheless received a fair trial and his conviction resulted from the strong evidence of guilt and not from passion or prejudice and the jury returned the only verdict that could reasonably be returned. Other arguments made by defendant have been considered and deemed without substance and no purpose would be served by discussing them in this opinion. Accordingly, the verdict of guilty will be affirmed.

Judgment affirmed.

EBERSPACHER and MORAN, JJ., concur.